## CHARLESTON

### STATE *v.* SMITH.

Submitted January 15, 1907.     Decided February 19, 1907

1. INTOXICATING LIQUORS—*Illegal Sale—C. O. D. Shipment—Evidence,*
   Under an indictment for selling spirituous liquors, the state resting her case on evidence that defendant, as a railroad agent, delivered a box of liquors transported from Cincinnati consigned C. O. D. to a person who had not ordered the liquors, in violation of chapter 40, section 1, Acts of 1903, the defendant has right to introduce evidence for the purpose of showing that he made inquiry to learn whether the consignee had ordered the liquors to be sent him for his personal use, and acted *bona fide* in making such delivery. (p. 330.)

2. INTERSTATE COMMERCE—*Constitutional Law.*

Question. Is that clause of chapter 40, section 1, Acts of 1903, prohibiting railroad agents from delivering liquors to consignees not ordering the same, contrary to the commerce clause of the federal constitution. (p. 334.)

Error to Circuit Court, Barbour County.

Charles Smith was convicted of an illegal sale of liquor, and brings error.

*Reversed. Remanded.*

WM. T. GEORGE and FRED O. BLUE, for plaintiff in error.
CLARKE W. MAY, Attorney-General for the State.

BRANNON, JUDGE:

Charles Smith was indicted and fined in Barbour county, the indictment charging that he did unlawfully sell spirituous liquors without license. The State's evidence in support of the prosecution was that Smith, as agent of the Baltimore and Ohio Railroad Company, delivered to Arthur M. Blake boxes marked "Glass" proven to contain whiskey, shipped by a liquor dealer in Cincinnati, consigned C. O. D. to Blake, and received payment from Blake for the articles; and that Blake had not ordered the liquor to be sent to him. The statute on which the State would ask conviction is chapter 40, section 1, Acts of 1903, reading as follows: "That any agent or employe of any person, firm or corporation, carrying on the business of a common carrier, or any other person, who, without a State license for dealing in intoxicating liquors, shall engage in the traffic or sale of such liquors, or be interested for profit in the sale thereof, or act as the agent or employe or consignor or consignee of the same, or who shall solicit or receive any order for the sale of any intoxicating liquors, or deliver to any person, firm or corporation, any package, containing such intoxicating liquors, shipped "Collect on Delivery" or otherwise, except to a person having a State license to sell the same, or to the *bona fide* consignee thereof who has in good faith ordered the same for his personal use, shall be deemed to have made a sale thereof contrary to law, and guilty of a misdemeanor." On the trial, in connection with his own evidence that he believed that Blake had ordered the goods from Cincinnati, and had no reason to

believe to the contrary, the defendant, as well as the state, proved that when Blake called for the liquor, after being informed by letter from Cincinnati that the consigned article was at the railroad office, before Smith would deliver him the article he required Blake to sign, and he did sign, a receipt reading as follows:

"United States Express Company.

Nov. 1, 1905.

"This is to certify that the entire shipment of 1 Box Glass shipped by M. E. Stone, from Cinti. 10th day of Nov., 1905, is for my own personal use and is ordered by me and is not to be sold by me.

"Witness:   W. B. Robinson.        (Signed)    A. Blake."

The court refused to admit the receipt in evidence.

Was the receipt admissible? This depends on the question whether inquiry by the jury was proper as to Smith's knowledge or ignorance of the fact that the liquor had not been ordered by Blake to be sent to him from Cincinnati. The statute does not in words require that for conviction the act of delivery shall be with knowledge that the consignee had not ordered the liquor. It may be said simply to prohibit the act. We find in 12 Cyc. 148 the following: "As a general rule where an act is prohibited and made punishable by statute, the statute is to be construed in the light of the common law and the existence of a criminal intent is essential. The legislature, however, may forbid the doing of an act and make its commission criminal without regard to the intent of the doer, and if such an intention appears the courts must give it effect although the intention may have been innocent. Whether or not in a given case a statute is to be so construed is to be determined by the court by considering the subject-matter of the prohibition as well as the language of the statute, and thus ascertaining the intention of the legislature." It will there appear that the authorities are many each way. I think the principles stated in Bishop's Statutory Crimes, section 1022, are pertinent. "Under these statutes the question of the effect of a mistake of fact, discussed or adverted to in several other connections, has often arisen. It is not proposed to repeat the former discussions; they are referred to in a note, and the reader is re-

quested to examine them. The result, derivable both from the places referred to and from the decisions under the present head, is that one whom the law permits to sell intoxicating liquor, and whose purpose and endeavor it is to conform to the law in all things, and to do no wrong of any sort, is legally, the same as he is morally, justified in acting, like other people in respect of other things, on what upon careful investigation and inquiry appear to be the facts; so that, if believing the appearances he does what would be legally and morally right were the real facts so, he is not punishable though he was deceived and they were different. Thus, if one authorized to sell liquor to adults and forbidden to sell it to minors is, without his fault or carelessness, led to believe an applicant to be an adult, while truly he is a minor, he is not punishable though he makes the sale,—a proposition which some deny. And the same doctrine applies under the statutes permitting sales generally but not to habitual drunkards. It applies, likewise, to the question of the intoxicating quality of the liquors sold; but there are cases in denial of this. Where the statute is silent as to the defendant's intent or knowledge, the indictment need not allege or the government's evidence show that he knew the fact; his being misled concerning it is matter for him to set up in defense and prove. Quite different are the law and procedure where the statute has the word 'knowingly' or the like; knowledge is then an element in the crime, the indictment must allege it, and the evidence against the defendant affirmatively establish its existence." It is beyond question that our own cases say that where a statute simply prohibits the sale of liquor in certain cases, as to minors, without some word like "knowingly" or other expression, the doing of the act fixes the offence, no matter about the knowledge or ignorance or intent of the accused. It need not be alleged in the indictment that the party knew the purchaser to be a minor, or intoxicated, or in the habit of becoming so. *State* v. *Baer*, 37 W. Va. 1; *State* v. *Farr*, 34 *Id.* 84; *State* v. *Cain*, 9 *Id.* 559. Nor can it be relied on in defence. Those cases rest on statute making the mere act an offence. But I draw a line of difference between those cases and this. The statute we are construing allows the delivery of a liquor consignment by the agent to one "who is a *bona fide* consignee

thereof, who has in good faith ordered the same for his personal use.'' Thus, the statute introduces into the case the question whether the person is one who has in good faith ordered liquor for his personal use. It does not so qualify other clauses, evincing design to make a difference as to the act of delivery. This surely allows the agent to make inquiry touching this matter. Can he not take precaution as to this to protect himself; to know whether he ought to deliver the article? Does the statute mean that the agent must infallibly, in every instance, guarantee that the consignee is one who in good faith has ordered the liquor for his personal use? Does it mean that when the agent has taken care to make such reasonable investigation as to that as a prudent person would adopt, but it turns out that the consignee did not order the liquor, the agent is nevertheless guilty? I think not. I think that he can show in his defense that he instituted prudent investigation to learn the truth. Therefore, we conclude that the receipt, a part of the *res· gestae*, containing Blake's direct statement that he had ordered the box for his own personal use, should have gone to the jury as tending to show that Smith acted in good faith and believed that Blake was a *bona fide* consignee, to enable the jury to say whether, under all the circumstances, Smith acted honestly and in good faith. If such agent delivers a box or package containing liquor, but not disclosing the character of its contents, does the statute mean that he is guilty, though he may not have known the contents? Must the agent investigate every box? How? He cannot break the box. If he makes fair investigation, and has reasonable ground to believe the box does not contain liquor, is he nevertheless guilty? Is that the real meaning of the statute? This doctrine may, in many cases, defeat the design of the statute; still, we must not give the act a construction to promote injustice, and inflict punishment on the innocent agent.

The question of the validity of this act under the interstate commerce clause of the Constitution of the Union is raised. The act does not forbid the consignment of liquor to licensed dealers or to consignees under real purchase. It does not forbid *bona fide* interstate commerce. Its object, so far as the point of this case goes, would seem to be to forbid a liquor dealer sending liquor to a person who had made no purchase, no

previous order, the policy of the state being to prevent persons electioneering for purchasers, tempting persons to drink, tempting persons to buy who before had not thought of buying, and thus spread the evil of drunkenness more extensively and debauch the people more than legitimate traffic would do. Can the statute, under its police power, thus adopt and execute a policy? May the state prevent acts in fraud of its laws? We do not answer this question, because we find that the judgment must be reversed on other ground, and the question may never arise. In *Edgell* v. *Conaway*, 24 W. Va. 747, it is held that "A court will not pass on the constitutionality of a statute, unless a decision on that very point is necessary to the determination of the case."

Our conclusion is to reverse the judgment, set aside the verdict, and remand the case for a new trial.

*Reversed.    Remanded.*

POFFENBARGER, JUDGE, dissenting as to construction of statute, but concurring in reversal of judgment and granting of new trial.

On the 10th, 14th and 18th days of November, 1905, M. E. Stone, a dealer in spirituous liquors at Cincinnati, Ohio, shipped from said city by the United States Express Company, under a C. O. D. consignment, three several packages of whiskey to Arthur Blake, at a place on the Baltimore and Ohio Railroad, in Barbour county, this State, called Arden, Blake had given no order for any of the packages. Stone shipped them as aforesaid and, at or about the dates of shipment, notified Blake that the packages were, or would be, at the express office at Arden, consigned to him and would be delivered to him on payment of the C. O. D. charges. Willing to accept the liquor and pay for it, though not ordered, Blake did so, and deliveries thereof were made by the express company through its agent, Charley Smith, who did not know the liquor had not been ordered. Before delivering the packages, he had Blake sign receipts therefor, containing the statement that he had ordered it. Afterward, Smith was indicted for violation of section 1 of chapter 40 of the Acts of 1903, and convicted and fined $50.00, and he has brought the judgment here for review on a writ of error.

The statute aforesaid reads as follows: "That any agent or employe of any person, firm or corporation, carrying on business of a common carrier, or any other person, who, without a State license for dealing in intoxicating liquors, shall engage in the traffic or sale of such liquors, or be interested for profit in the sale thereof, or act as the agent or employe or consignor or consignee of the same, or who shall solicit or receive any order for the sale of any intoxicating liquors, or deliver to any person, firm or corporation, any package containing such intoxicating liquors, shipped 'Collect on Delivery' or otherwise, except to a person having a State license to sell the same, or to the *bona fide* consignee thereof who has in good faith ordered the same for his personal use, shall be deemed to have made a sale thereof contrary to law, and guilty of a misdemeanor; and, upon conviction thereof shall be fined not less than ten, nor more than one hundred dollars, and may, at the discretion of the court, be imprisoned in the county jail not exceeding six months." As it appears from the facts detailed in the evidence that the consignee had not in fact ordered the liquor, the delivery was made in plain violation of the letter of that portion of the statute which inhibits a delivery except to a *bona fide* consignee who has in good faith ordered the liquor for his personal use, unless, by some process of construction, we may be able to say that, within the meaning of the law, the goods had been ordered. No principle is perceived upon which this conclusion can be reached. It is expressly stated by the consignee that he had not ordered the packages and did not know of their shipment, until he received letters, telling him they were at the express office for him or would be there. The letter and consignment could have constituted nothing more than an offer to sell which Blake had not accepted. Though, on receipt of the letter, he may have mentally assented to the proposition of sale, he did not in any way signify his intention to accept, until he appeared at the office of the express company and paid the charges and accepted the packages. The making of a contract involves the acceptance of the offer as well as the offer itself and the acceptance must be evidenced by some act on the part of the person to whom the offer is made. In this instance, the person to whom it was made said nothing and did nothing, respecting it, until he

appeared at the office of the express company and obtained the packages. Legal principles, authority and reason unite ·in saying the contract of sale was made at Arden, West Virginia, in each instance, and not at Cincinnati, Ohio. Moreover, it must be apparent that the consignee did not at any time order the shipment. . It was made without his knowledge or consent. Though he did afterwards accept, the shipment was not in any sense his act, was not made by his authority, nor on his behalf, and his acceptance of the liquors cannot be regarded as a ratification of any previous transaction purporting to have been done by his direction or authority.

If the statute is valid, and is applicable to such transactions, the guilt of the defendant is beyond question. But invalidity of the statute is urged on the ground that the enforcement thereof according to its letter, gives it extra-territorial operation and effect, and works a restraint upon interstate commerce, in violation of the Commerce Clause of the federal Constitution. Whether it restrains interstate commerce, and, in the sense of restraining it, regulates the same, is the only important question presented. Its solution requires a review and consideration of those federal decisions which determine the character and status of intoxicating liquors as commercial articles, define interstate commerce, mark the limits of the police power of the states, and indicate the extent to which Congress has removed restrictions upon the exercise of state control and regulation of intoxicating liquors, by denying to them the character of commercial articles.

It has been definitely settled for a long time by the decisions of the federal Supreme Court that intoxicating liquor is a legitimate commercial article, having the same status in interstate commerce as other trade commodities, such as wheat, corn, flour, live stock and manufactured articles, except in so far as a certain act of Congress, known as the Wilson Act, passed on the 8th day of August, 1890, has deprived them of that character. In the *License Cases*, 5 How. 504, 577, decided in 1847, Chief Justice Taney said, after referring to other things having a different status in law: "But spirits and distilled liquors are universally admitted to be subjects of ownership and property, and are therefore subjects of exchange, barter and traffic, like any other com-

modity in which a right of property exists." In the same
case, Mr. Justice Catron said: "That ardent spirits have
been for ages, and now are, subjects of sale and of lawful
commerce, and that of a large class, throughout a great por-
tion of the civilized world, is not open to controversy; so
our commercial treaties with foreign powers declare them to
be, and so the dealing in them among the states in this
Union recognizes them to be." The character thus given to
spirituous liquors, in the absence of legislation divesting
them of it, has ever since been maintained. *Crutcher* v.
*Kentucky*, 141 U. S. 60; *Leisy* v. *Hardin*, 135 U. S. 100;
*State* v. *Lichtenstein*, 44 W. Va. 99.

Because it is a legitimate subject of commerce, the state
cannot affect it by legislation in the exercise of its police
power as it can some other things. This distinction was ob-
served in the License Cases, cited. At page 576, Chief Jus-
tice Taney said: "It has, indeed, been suggested, that, if
a State deems the traffic in ardent spirits to be injurious to its
citizens, and calculated to introduce immorality, vice, and
pauperism into the State, it may constitutionally refuse to
permit its importation, notwithstanding the laws of Congress;
and that a State may do this upon the same principles that it
may resist and prevent the introduction of disease, pestilence
or pauperism from abroad. But it must be remembered that
disease, pestilence, and pauperism are not subjects of com-
merce, although sometimes among its attendant evils. They
are not things to be regulated and trafficked in, but to be
prevented, as far as human foresight or human means can
guard against them." It has been rigidly maintained ever
since by the federal Supreme Court and the courts of the
several states. *Plumley* v. *Massachusetts*, 155 U. S. 461,
where it is declared that "the states may legislate to prevent
the spread of crime, and may exclude from their limits pau-
pers, convicts, persons likely to become a public charge, and
persons afflicted with contagious or infectious diseases."
The decision itself sustains a state statute, prohibiting the
sale of oleomargerine, so colored as to cause it to look like
yellow butter. It placed no restraint upon dealings in oleo-
margerine not so colored and sold or offered for sale for what
it really was. The act was sustained on the ground that the
State has power to prevent fraud and deception in which no

man can have any right of property. The real subject matter of the act, the fraud, was not in any sense an article of commerce and under its police power the State could exclude it by legislation, as if it were disease or pestilence. The decision in *Missouri, Kansas & Texas Ry.* v. *Haber*, 169 U. S. 613, sustains a Kansas statute, imposing liability upon a railroad company for damages, resulting from its carrying into the State cattle capable of communicating Texas, splenic or Spanish fever, a disease peculiar to southern range cattle. Another statute, having the same ostensible purpose, but so broad in its terms and effect as to impose liability for importing sound and healthy cattle, and so interfere with interstate commerce, had been declared unconstitutional for that reason in *Railroad Co.* v. *Husen*, 95 U. S. 465.

Having recognized the commercial character of spirituous liquors, which places them under the protection of national law, and beyond the police power of the states, as long as they remain in the channels of interstate commerce, the federal Supreme Court proceeded to ascertain the point at which imported liquors cease to be articles of interstate or foreign commerce and become a part of the common mass of the property of the state into which they have been carried, and it was settled at an early date that they were not divested of their commercial character so long as they remained unsold in the hands of the importer in the packages in which they had been shipped. In *License Cases*, 5 How. 504, at page 575, Chief Justice Taney said: "Indeed, goods imported, while they remain in the hands of the importer, in the form and shape in which they were brought into the country, can in no just sense be regarded as a part of that mass of property in the State usually taxed for the support of the State government. The immense amount of foreign products used and consumed in this country are imported, landed and offered for sale in a few commercial cities, and a very small portion of them are intended or expected to be used in the State in which they are imported. A great (perhaps the greater) part imported, in some of the cities, is not owned or brought in by the citizens of the State, but by citizens of other States, or foreigners. And while they are in the hands of the importer for sale, in the form and shape in which they were introduced, and in which they are intended to be sold, they

may be regarded as merely *in transitu*, and on their way to the distant cities, villages, and country for which they are destined, and where they are expected to be used and consumed, and for the supply of which they were in truth imported." In this he simply reiterated what had been said by Chief Justice Marshall in *Brown* v. *Maryland*, 12 Wheat. 419, decided twenty years earlier. See pages 441–2. *Pierce* v. *New Hampshire*, one of the *License Cases*, although recognizing the original package doctrine, sustained the assertion of state power over a cask of imported gin, while yet in the hands of the importer in the same condition in which it had been shipped into the State, because Congress had not then passed any law regulating commerce among the states. It was assumed there that the constitutional grant of power to Congress to regulate commerce among the states was not in effect a declaration of freedom of such commerce and, therefore, a denial to the states of power to regulate or control it. In this respect, the decision has since been overruled. *Leisy* v. *Hardin*, 135 U. S. 100, affirming the right of the importer to sell liquor in original packages, notwithstanding state laws to the contrary and declaring such laws void. It had been virtually so held in the previous case of *Bowman* v. *Railway Co.*, 125 U. S. 465.

The doctrine of the *License Cases*, 5 How. 504, admitting power in the state to prohibit the sale in original packages of liquors imported from one state into another, prevailed from 1847 until 1889, when it was overthrown in *Leisy* v. *Hardin*. During that period of forty-one years, the power of the states to prevent sales of liquors in the original packages carried into one state from another, was admitted and effective, because Congress had not passed any law, authorizing or regulating interstate traffic in such articles. From this proposition Mr. Justice Catron had dissented in the *License Cases*, and it remained a subject of diversity of opinion among the justices of the Supreme Court until, as stated, the views of Mr. Justice Catron finally prevailed in *Leisy* v. *Hardin*. In that case, it was ascertained upon a review of previous decisions, including *Bowman* v. *Railway Co.*, that the legislative power of the states, being supreme as to all subjects falling strictly within their police power, state statutes regulating such subjects and operative within the territorial lim-

its of the states were enforcible, though incidental interference with interstate commerce might result from the enforcement thereof; that, by constitutional reservation, the states have the right to enact and enforce inspection laws, applicable to legitimate articles of commerce, (Article 1, section 10, clause 2, Con.); that where the subjects upon which Congress can act under its commercial power are local in their nature or sphere of operation, such as harbor pilotage, improvement of harbors, establishment of beacons and buoys to guide vessels in and out of port, construction of bridges over navigable rivers, erection of wharves, piers and docks, and the like, which can be properly regulated only by special provisions adapted to their localities, the states can act until Congress interferes and supersedes their authority; that, where the subject is national in its character, and admits and requires uniformity of regulation, affecting alike all the states, such as transportation between the states, including the importation of goods from one state into another, Congress alone can act upon it and provide the needed regulations; and that, in cases in which the subject is susceptible of government or regulation by a uniform rule, the absence of any law of Congress respecting it is equivalent to a declaration by Congress that commerce in it shall be free and unhampered. Having enunciated these principles as settled law and found that the nature of spirituous liquors as articles of commerce among the states is such as to enable Congress to regulate such commerce in them by a uniform rule, *Pierce* v. *New Hampshire*, one of the *License Cases*, was overruled, and the power of the states to prohibit sales of liquors in original packages, imported from one state into another, denied.

For the purpose of restoring, conferring or unobstructing the power thus denied to the states, Congress, on the 8th day of August, 1890, passed, what is known as the Wilson Act, providing "That all fermented, distilled or other intoxicating liquors or liquids transported into any state or territory, or remaining therein for use, consumption, sale or storage therein, shall upon arrival in such state or territory be subject to the operation and effect of the laws of such state, or territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such

liquids or liquors had been produced in such state or terri-
tory, and shall not be exempt therefrom by reason of being
introduced therein in original packages or otherwise.'' The
validity of this act was called in question, on constitutional
grounds, in the case of *Rahrer*, 149 U. S. 545, but the court
sustained the act.   Rahrer had placed himself directly within
its terms, wherefore there was no occasion to construe it or
define with exactness the limits of state power under it.   In
subsequent cases, however, it has been construed. In *Rhodes*
v̄. *Iowa*, 170 U. S. 412, it was determined and declared that
the statutes of a state, prohibiting the sale of imported
liquors in original packages, or otherwise affecting them,
cannot apply while the merchandise is in transit under ship-
ment, nor until after its arrival at the point of destination and
delivery there to the consignee.   Some of the justices were of
opinion that such merchandise became subject to state laws
immediately upon crossing the state line, but a majority of
the court were of opinion that the states have no power to
deal with it until after delivery by the common carrier, and
so the law has stood ever since.   In that case, a box of spir-
ituous liquors had been shipped by rail from a point in Illi-
nois to a citizen of Iowa at his residence in that state.   After
its arrival at the station, the package was placed by the
trainmen on the platform and afterwards removed by the
station agent into the railroad company's freight warehouse,
distant from the platform about six feet.   About an hour
later, the box was seized by a constable under a search war-
rant on the ground that it contained intoxicating liquors, and
the liquor was subsequently condemned and ordered to be de-
stroyed, which was done.   Under these circumstances, the
court held that the liquor had not been divested of its inter-
state commercial character, because it had not yet been de-
livered to the consignee, and therefore that the seizure was
illegal and void.   In *Scott* v. *Donald*, 165 U. S. 58, and
*Vance* v. *Vandercook Co.*, 170 U. S. 438, cases which arose
under the Dispensary Law of South Carolina, the Wilson
Act was further construed with reference to its scope and
effect.   In the first case, the statute was held void in so far
as it prohibited the importation of wines and liquors of other
states by citizens of South Carolina for their own use.   This
provision was not dependent upon the purity or impurity of

the articles, nor were wines and liquors excluded from the state. The object of the law was to limit all importation of liquors and dealings therein to certain state functionaries. It forbade importation thereof by private citizens for their own use, as a means of sustaining and effectuating this main purpose, and the claim of validity of such legislation was predicated upon the view that the Wilson Act had so far removed restraint upon the powers of the state as to enable it to accomplish this purpose. But the reply of the court, speaking through Mr. Justice Shiras, was as follows: "That law was not enacted to confer upon any state the power to discriminate injuriously against the products of other states in articles whose manufacture and use are not forbidden, and which are therefore the subjects of legitimate commerce. * * * The question whether a given state law is a lawful exercise of the police power is still open, and must remain open as to this Court. Such a law may forbid entirely the manufacture and sale of intoxicating liquors and be valid. Or it may provide equal regulations for the inspection and sale of all domestic and imported liquors and be valid. But the state cannot, under the Congressional legislation referred to, establish a system which, in effect, discriminates between interstate and domestic commerce in commodities to make and use which are admitted to be lawful." This point having been settled and the statute so amended as not to prohibit residents from importing liquors for their own use, the *Vandercook Case* arose, in which the validity of the law was again assailed on the ground that it imposed, upon the exercise of that right of residents, conditions which affected and restrained interstate commerce and amounted to a regulation thereof. The court held the act unconstitutional in so far as it compelled the resident of the state, desiring to order alcoholic liquors for his own use, to first communicate his purpose to a state chemist, and in so far as it deprived any nonresident of the right to ship by means of interstate commerce any liquor into South Carolina without having obtained previous authority so to do from the officers of said state. The reason for the holding is set forth in the syllabus in the following terms: "On the face of these regulations, it is clear that they subject the constitutional right of the nonresident to ship into the state and of the resident in the state

to receive for his own use, to conditions which are wholly
incompatible with and repugnant to the existence of the right
which the statute itself acknowledges.'' Mr. Justice White,
in delivering the opinion of the Court, further said: ''The
right of the citizen of another state to avail himself of inter-
state commerce cannot be held to be subject to the issuing of
a certificate by an officer of the state of South Carolina,
without admitting the power of that officer to control the
exercise of the right. But the right arises from the Consti-
tution of the United States. It exists wholly independent of
the will of either the lawmaking or the executive power of
the state; it takes its origin outside of the state of South
Carolina, and finds its support in the Constitution of the
United States. Whether or not it may be exercised depends
solely upon the will of the person making the shipment,
and cannot be in advance controlled or limited by the action
of the state in any department of its government.'' The
latest case on the subject is that of *American Express Co.
v. Iowa*, 196 U. S. 133, involving the right to ship liquor
from one state into another under a C. O. D. consignment.
The liquor in that case was seized in the hands of the Express
Company's agent, and the question presented was whether
the seizure was valid, and this depended upon the validity of
the statute which purported to authorize it. The state
attempted to uphold the seizure upon the theory that the
sale had been made at Tama, Iowa, the place to which the
package was consigned and shipped, and not at Rock Island,
Illinois, the place from which it was shipped upon the order
of the consignee. After adverting to many decisions herein-
before cited, the Court held as follows: ''Without passing
on the question whether the property in a C. O. D. ship-
ment is at the risk of buyer or seller and when the sale is
completed, a package of intoxicating liquor received by an
express company in one state to be carried to another state,
and there delivered to the consignee C. O. D. for price of
the package and the expressage, is interstate commerce and is
under the protection of the commerce clause of the federal
Constitution and cannot, prior to its actual delivery to the
consignee, be confiscated under prohibitory liquor laws of the
state.'' It was further held that the contract to sell and
ship had been made in Illinois.

As none of the decisions hereinbefore referred to declare the law applicable to the facts in this case, the contract between the shipper and the consignee having been made in this state, and not beyond its limits, as in the case of *Rhodes* v. *Iowa* and *American Express Co.* v. *Iowa*, but the contract between the consignor and the common carrier having been made beyond the limits of the state, it becomes necessary to prosecute an inquiry as to what amounts to a restraint upon interstate commerce, keeping in view the general principles enunciated by the decisions already adverted to. Much of what is to be said on this subject will be gleaned, for the most part, from the opinions expressed in those cases, but the principles relating to it are not peculiar to liquor cases. They are expounded and applied in decisions relating to many other subjects. Louisiana passed a statute which required those engaged in the transportation of passengers among the states to give all persons traveling within that state, upon vessels employed in such business, equal rights and privileges in all parts of the vessel, without distinction on account of race or color. In *Hall* v. *De Cuir*, 95 U. S. 485, this statute was held to be in effect a regulation of interstate commerce and accordingly declared void in so far as it required such vessels to carry colored passengers in Louisiana in the same cabin with white passengers. The Court said: "If the public good requires such legislation it must come from Congress and not from the states." In determining whether or not the statute interfered with interstate commerce, the Court considered its operation and effect, upon the conduct and business of such carriers, in accepting and providing for passengers taken up outside of the state to be carried into it. Though it did not purport on its face or by its terms to operate extra-territorially, the Court looked to its direct effect outside of the state, and, perceiving that it did affect the conduct of the carrier in taking passengers beyond the limits of the state to be carried into and through it, unanimously held that the statute was thereby vitiated. Chief Justice Waite said: "But we think it may safely be said that State legislation which seeks to impose a direct burden upon inter-state commerce, or to interfere directly with its freedom, does encroach upon the exclusive power of Congress. The statute now under consideration, in

our opinion, occupies that position. It does not act upon the business through the local instruments, to be employed after coming within the State, but directly upon the business as it comes into the State from without or goes out from within. While it purports only to control the carrier when engaged within the State, it must necessarily influence his conduct to some extent in the management of his business throughout his entire voyage. His disposition of passengers taken up and put down within the State, or taken within to be carried without, cannot but affect in a greater or less degree those taken up and put down without. A passenger in the cabin set apart for the use of whites without the State must, when the boat comes within, share the accommodation of that cabin with such colored persons as may come on board afterwards, if the law is enforced. * * * * * No carrier of passengers can conduct his business with satisfaction to himself, or comfort to those employing him, if on one side of a State line his passengers, both white and colored, must be permitted to occupy the same cabin, and on the other be kept separate. Uniformity in the regulations by which he is to be governed from one end to the other of his route is a necessity in his business, and to secure it Congress, which is untrammelled by State lines, has been invested with the exclusive legislative power of determining what such regulation shall be.'' This principle was applied in *Bowman* v. *Railway Co.*, 125 U. S. 465. There it is explicitly held that, although a statute, prohibiting traffic in liquors, purports on its face to deal only with such commodities after they have been brought within the State, is void if it so operates as to influence the conduct of persons engaged in such traffic while acting beyond the limits of the State. They cannot impose conditions which will compel common carriers or other persons to recognize and enforce them in any degree whatever at places beyond the state line. Mr. Justice Mathews said:  '' The principle thus announced has a more obvious application to the circumstances of such a case as the present, when it is considered that the law of the State of Iowa under consideration, while it professes to regulate the conduct of carriers engaged in transportation within the limits of that State, nevertheless materially affects, if allowed to operate, the conduct of such carriers, both as re-

spects their rights and obligations, in every other state into or through which they pass in the prosecution of their business or interstate transportation. In the present case, the defendant is sued as a common carrier in the State of Illinois, and the breach of duty alleged against it is a violation of the law of that State in refusing to receive and transport goods which, as a common carrier, by that law, it was bound to accept and carry. It interposes as a defence a law of the State of Iowa, which forbids the delivery of such goods within that State. Has the law of Iowa any extra territorial force which does not belong to the law of the State of Illinois? If the law of Iowa forbids the delivery, and the law of Illinois requires the transportation, which of the two shall prevail? How can the former make void the latter? In view of this necessary operation of the law of Iowa, if it be valid, the language of this court in the case of *Hall* v. *De Cuir*, 95 U. S. 485, 488, is exactly in point." This rule has its exceptions as does almost all others, but the exceptions do not include spirituous liquors. That commodity falls under the general rule. As has been stated, there is an exception in the case of inspection laws and in the case of those things which do not belong to commerce and are not considered legitimate commercial articles. Since the Constitution itself, makes an exception in respect to the power of the states to pass inspection laws, the courts admit their authority to adopt all reasonable means of making such laws effective, even to the extent of allowing them some degree of operation beyond the state lines. In respect to those things that are not considered legitimate commercial objects and fall strictly within the police power of the states, state legislation is valid, however much it may interfere with dealings in such articles within or without the state; for as to these matters, the powers of the state are beyond the control of the national government and cannot be restrained. On this subject, Mr. Justice Catron said, in 5 How. 504, 599: "The assumption is, that the police power was not touched by the Constitution, but left to the States, as the Constitution found it. This is admitted, and whenever a thing, from character or condition, is of a description to be regulated by that power in the State, then the regulation may be made by the State, and Congress cannot interfere. But this must always depend

on facts subject to legal ascertainment, so that the injured may have redress. And the fact must find its support in this, whether the prohibited article belongs to, and is subject to be regulated as part of, foreign commerce, or of commerce among the States. If, from its nature, it does not belong to commerce, or if its condition, from putrescence or other cause, is such, when it is about to enter the State, that it no longer belongs to commerce, or, in other words, is not a commercial article, then the state power may exclude its introduction. And as an incident to this power, a State may use means to ascertain the fact. And here is the limit between the sovereign power of the state and the federal power." In *Bowman* v. *Railway Co.*, Mr. Justice Matthews, construing the language used in the *Licensed Cases*, spoke as follows: "Doubtless the States have power to provide by law suitable measures to prevent the introduction into the States of articles of trade, which, on account of their existing condition, would bring in and spread disease, pestilence, and death, such as rags or other substance infected with the germs of yellow fever or the virus of small pox, or cattle or meat, or other provisions that are diseased or decayed, or otherwise, from their condition and quality, unfit for human use or consumption. Such articles are not merchantable; they are not legitimate subjects of trade and commerce. They may be rightly outlawed as intrinsically and directly the immediate sources and causes of destruction to human health and life. The self-protecting power of each State, therefore, may be rightfully exerted against their introduction, and such exercises of power cannot be considered regulations of commerce prohibited by the Constitution." There are some other exceptions which need not be noticed.

Perhaps no case better illustrates what amounts to a restraint upon interstate commerce, that the states cannot impose, than that of *Bowman* v. *Railway Co.*, cited. The Iowa statute forbade common carriers to bring intoxicating liquors into the state from any other state or territory, without having been furnished with a certificate, under the seal of the auditor of the county to which it was to be transported or consigned, certifying that the consignee or person to whom it was to be transported or delivered was

authorized to sell intoxicating liquors in the county. It had been passed without any purpose of affecting interstate commerce, but as a means of enforcing the liquor laws of the state. The effect of it was to impose a restriction upon the powers of common carriers to accept shipments in other states. Its enforcement would have compelled them to be governed in their conduct in other states by the law of Iowa. Enforcing the principle that state laws, except as to subjects not belonging to commerce, but falling only within the police power, cannot have any extra-territorial force or validity in respect to interstate commerce, the Court held the statute to be no defense to an action brought against the railroad for damages for its refusal to accept the shipment. This decision was rendered in advance of the passage of the Wilson Act; but *Rhodes* v. *Iowa* and *Vance* v. *Vandercook*, decided since the passage of that Act, enforce the same principle, holding that the Wilson law has not imparted to the states any power to legislate extra-territorially in respect to intoxicating liquors. An attempt was made to sustain the seizure in *Rhodes* v. *Iowa* on the ground that the railroad company had accepted the consignment without having obtained a certificate showing that the consignee was authorized to sell intoxicating liquors in the county into which they had been carried. In that case Mr. Justice White, delivering the opinion, repeated and applied what has been hereinbefore quoted from the opinion of Mr. Justice Catron in *Hall* v. *DeCuir* and Mr. Justice Matthews in the *Bowman Case*. And again in *Vance* v. *Vandercook*, stress was laid upon the same principle. The court said: "The regulation, then, compels the resident of the State who desires to order for his own use, to first communicate his purpose to a state chemist. It moreover deprives any non-resident of the right to ship by means of Interstate Commerce any liquor into South Carolina unless previous authority is obtained from the officers of the State of South Carolina. On the face of these regulations, it is clear that they subject the constitutional right of the non-resident to ship into the State and of the resident in the State to receive for his own use, to conditions which are wholly incompatible with and repugnant to the existence of the right which the statute itself acknowledges. The right of the citizen of another State to

avail himself of Interstate Commerce cannot be held to be subject to the issuing of a certificate by an officer of the State of South Carolina, without admitting the power of that officer to control the exercise of the right." In the late case of *American Express Co.* v. *Iowa,* the same doctrine is asserted with emphasis. Mr. Justice White, delivering the opinion of the court, said: "Coming to test the ruling of the court below by the settled construction of the commerce clause of the Constitution, expounded in the cases just reviewed, the error of its conclusion is manifest. Those cases rested upon the broad principle of the freedom of commerce between the States and of the right of a citizen of one State to freely contract to receive merchandise from another State, and of the equal right of the citizen of a state to contract to send merchandise into other States. They rested also upon obvious want of power of one State to destroy the contracts concerning interstate commerce, valid in the states where made. * * * * To sustain, therefore, the ruling of the court below would require us to decide that the law of Iowa operated in another State so as to invalidate a lawful contract as to interstate commerce made in such other State."

It is to be further observed that in almost every interstate transaction of a commercial character two contracts are made, one between consignor and consignee, the contract of sale, and the other between the consignor and the common carrier, the contract of shipment; and the decisions hereinbefore reviewed establish beyond question the interstate-commercial character of both contracts, as well as that of the shipment itself and the delivery of the merchandise to the consignee at the place of destination. Moreover, the duty of a common carrier to accept merchandise offered for shipment is a part of interstate commerce which cannot be controlled by state laws beyond the limits of the state passing them. This is the direct and inevitable import of the decision in the *Bowman Case.* That a contract of shipment between consignor and the common carrier, made without the state, is not subject to state control or regulation is likewise the import of the decision in the Rhodes and American Express Company cases.

That the enforcement of the statute in question here, as

construed by the court below and applied under the circumstances of this case, would make it operate as a regulation of interstate commerce, is, I think, entirely clear. Though, as has been indicated, an interstate contract was not effected between the consignor and the consignee, such a contract between the consignor and the common carrier was made. At Cincinnati, in the State of Ohio, the United States Express Company made valid contracts with Stone, by which it bound itself to carry into the State of West Virginia, and there deliver to a third person, certain quantities of liquor. They were contracts which bound the common carrier to make interstate shipments. The contracts of shipment covered the reception of the goods, their carriage and delivery, and performance thereof extended from one state into another, wherefore they were essentially interstate contracts. Nothing in the laws of the State of Ohio forbade the making of these contracts and the principles of federal law above stated deny to the laws of West Virginia any power to restrain, influence or control parties in effecting them. To permit them to do so, would allow them to operate and be effective in a state other than that in which they were ordained. No law in the State of Ohio requires a common carrier to ascertain whether goods offered for shipment have been ordered and sold, and to take them for shipment at the risk of a penalty for receiving for shipment an unordered consignment. The enforcement of this statute would compel every express company to make such inquiry and satisfy itself that every parcel of liquor offered to it for shipment at places outside of this State had been ordered. That is an investigation which no other law requires it to make. That is a duty which the laws of West Virginia would impose outside of the state. Performance of that duty would entail both expense and delay, as well as hazard. It would be necessary, in the performance of that duty, to take, file and preserve, in some form, evidence of the fact that the goods had been ordered in every such instance, and all this would be the direct effect in the state of Ohio and other places, of West Virginia laws. Moreover, the foreign shipper would have to make his conduct conform to the requirements of West Virginia laws before he could obtain a contract for the shipment of his goods. But for this statute, he could send his

packages to the express offices and have them accepted for
shipment without question and without delay. Under its op-
eration, however, every package must be accompanied by a
certificate or an affidavit or some sort of evidence, showing
that the contents have actually been ordered or sold. Unre-
strained by such legislation, he may deliver his packages
for shipment to any person, whether a *bona fide* purchaser
or not. He may consign them to himself and no law, not
even the statute now under consideration, would forbid the
shipment. For illustration, take the case of an order made
and accepted in good faith. This law would make the shipper,
in every such case, prove, to the satisfaction of the common
carrier, the making of the contract before he could ship the
goods. To allow a law of this state to so influence and control
the conduct of persons doing business in other states, is to
impart to those laws efficacy and virtue beyond the state
lines in respect to interstate commercial transactions. This
is the direct and immediate, not merely the incidental, effect
of their enforcement, and, therefore to allow them to so op-
erate, would be to allow the state to impose conditions and re-
straints upon such transactions and thereby regulate com-
merce between the states.

As the statute so construed would be plainly unconstitu-
tional and void, a rule of construction impels us to say that
the legislature never intended it to apply to such transac-
tions as the one disclosed by the evidence in this case.
There is a presumption that the legislature knew the limit
of its powers and had no intention, in passing an act which
seems to transcend them, to act in excess of its powers. A
recent case decided by this Court enforces this rule in the
construction of a statute which, it was claimed, had such
scope as to cover an interstate commercial transaction.
Instead of giving it a construction that would have ren-
dered it unconstitutional, and declaring it to be so, this
Court held that the legislature did not intend it to oper-
ate to the full extent of its literal support. *Underwood
Typewriter Co.* v. *Piggott*, 60 W. Va., 532, (55 S. E.
664.)

Some of my associates, constituting a majority of the
Court seem to be of the opinion that, if the element of in-
tent, on the part of the agent, to violate the statute be read

into it, as one of its implied conditions, it would be valid and enforceable. On this theory, they reverse the judgment, because the court refused to permit the introduction of the receipt, signed by the consignee and delivered to the agent, whereby he represented that he had ordered the liquor. They are apparently of the opinion that, if said receipt had been allowed to go in, as evidence of the good faith of the agent, tending to show that he acted under the belief that the liquor had been ordered and had no intention of violating the statute, and he had then been convicted, the judgment would have to be affirmed. In this view, I do not concur. The delivery made by the agent was a final step, on the part of the express company, in the performance of the lawful contract it had made in the State of Ohio. He simply did, for and on behalf of the express company, that which it was bound by its contract to do, and justified by federal law in doing. To deny to the agents of these companies the power to make such deliveries, amounts to a denial of the power of the companies themselves to fulfill their interstate commercial contracts. If the agent had known the liquor had not been ordered, such knowledge would have been no justification for the refusal of the express company, his principal, to fully execute its contract, and, to prohibit the agent from executing it on behalf of his principal, is to deny to the principal the power to execute it. Refusal on the part of the express company to make the delivery would have put it in the same situation in which the railway company, in the *Bowman Case*, found itself. It was bound by the laws of Ohio to perform its contract and answerable in damages by that law for its failure to do so, just as in the *Bowman Case* the railway company was liable in damages, under the Illinois laws, for its refusal to accept liquors for shipment into the state of Iowa. In that case, Mr. Justice Matthews said: "In the present case, the defendant is sued as a common carrier in the State of Illinois, and the breach of the duty alleged against it is a violation of the law of that State in refusing to receive and transport goods which, as a common carrier, by that law, it was bound to accept and carry. It interposes as a defense a law of the State of Iowa, which forbids the delivery of such goods within that State. Has the law of Iowa any extra territorial force which does

not belong to the law of the State of Illinois? If the law of Iowa forbids the delivery, and the law of Illinois requires the transportation, which of the two shall prevail? How can the former make void the latter?" The Iowa statute, overthrown in that case, provided that if any express company, railway company or any agent or person in the employ of any express company, or any common carrier or any person in the employ of any common carrier, or any other person, should "knowingly bring within" the State for any other person or persons or corporation, any intoxicating liquors, without first having been furnished with a certain kind of certificate prescribed by the statute, such corporation, agent or person should be fined in the sum · of one hundred dollars for each offense. The Supreme Court of the United States held that it made no difference whether the liquors were knowingly or ignorantly brought into the state without such certificate. The decision turned upon the question of the power of the State of Iowa to impose restraint upon common carriers in respect to their business and conduct outside of the state. The matters of knowledge and intention were regarded as wholly immaterial. Afterwards, the statute was amended and the word "knowingly" stricken out. Then the case of *Rhodes* v. *Iowa*, 170 U. S. 412, arose and the Supreme Court of Iowa held that the effect of the statute was not altered by this amendment, and when the case went to the Supreme Court of the United States, that Court said: "This statute is identical with the one which was held to be unconstitutional in the *Bowman Case*, except that the latter contained the words 'knowingly bring within this State,' these words having been stricken out by an amendment adopted after the decision in the *Bowman Case*. * * * * It is hence manifest that the present statute, as interpreted by the Supreme Court of Iowa, has exactly the significance it would have did it contain the words found in the act reviewed in the *Bowman Case*." The Court held that, although the elements of knowledge and intent were thus embodied in the state, it was unconstitutional and void in so far as it attempted to affect liquors imported from another state until after the interstate contract of shipment had been completed by delivery of the consignment to the consignee.

*Edgell* v. *Conaway*, 24 W. Va. 747, cited in the majority opinion to the effect that a court will not pass upon the constitutionality of a statute, unless a decision upon that very point is necessary to the determination of the case, is no authority for the position that, to avoid passing upon such question, it suffices to find some error for which a judgment can be merely reversed and the case remanded with the expectation or hope that the result of the new trial will render such decision unnecessary. In *Edgell* v. *Conaway*, the defendants had obtained a verdict and a judgment in their favor before a justice, and again in the circuit court on an appeal taken by the plaintiff. In this Court, they undertook to obtain a decision that the statute allowing the appeal was unconstitutional, a wholly immaterial question unless it should be necessary to reverse the judgment for some error and remand for a new trial. Finding no error, and therefore, no reason for sending the parties back to the circuit court, this Court refused to pass upon the constitutional question. In this case we are remanding for a new trial, and impliedly telling the court below that if on the next trial the defendant should be convicted, the judgment will, or, at least, may, be affirmed. Had there been a reversal in *Edgell* v. *Conaway*, this Court would have defined the rights of the parties respecting the new trial. Here we take the opposite course, on reversing, and, though remanding, leave them in the dark as to their rights. Aye, more. We confuse them by expressing our doubt as to what may be done under this statute on the new trial.

Being of the opinion that this statute, properly construed, has no such scope and effect as the circuit court has given to it, and that the facts disclosed by the evidence do not constitute any offense under it, I would reverse the judgment, set aside the verdict, grant a new trial and remand the case.